# EXHIBIT 1

## SUPPLY AGREEMENT

This supply agreement (this "**Agreement**"), is made and entered into as of the 3rd day of December, 2018 ("**Effective Date**") by and between Waterloo Sparkling Water Corp., a Delaware corporation with offices at 2612 E. Cesar Chavez St. #200, Austin, TX 78702 ("**WSW**"), and Flavorman, a Kentucky corporation with offices at 809 South 8th Street, Louisville, KY 40203 ("**Supplier**").

**WHEREAS**, WSW wishes to engage Supplier to manufacture and supply to WSW certain products (each, a "**Product**"); and

**WHEREAS**, Supplier is willing to supply WSW such products pursuant to the terms and conditions as set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and promises contained in this Agreement, WSW and Supplier hereby agree as follows:

1. PURCHASE AND SALE OF THE PRODUCTS.

1.1   Purchase and Sale. This Agreement sets forth the terms and conditions under which Supplier shall manufacture, sell and deliver Products to WSW or its designees. Particular Products and their corresponding specifications and other properties and details (together, "**Specifications**") will be set forth on **Exhibit A** (for the first Product sold) and successive **Exhibit A**s (i.e. **A-2, A-3**, etc.) for any additional Products.

1.2   Exclusivity and Non-Compete. Supplier and its Affiliates shall not (i) manufacture, sell, distribute or otherwise produce any products (including OTS Flavors, defined in Section 12.1) that are the same as, or substantially similar to, the Products sold to WSW pursuant to this Agreement for any third party it knows (or should reasonably know) is directly or indirectly in the sparkling water business, or (ii) themselves manufacture and/or sell sparking water products (including without limitation as may contain the OTS Flavors contained in any Product), or (iii) manufacture, sell, distribute or otherwise produce any products whatsoever (including OTS Flavors) for any of the Restricted Parties named on **Exhibit B** or any of their Affiliates. "**Affiliate**" means, with respect to a party, any corporation or other business entity controlling, controlled by or under common control with such party. The term "**controlling**" (with correlative meanings for the terms "**controlled by**" and "**under common control with**") as used in this definition means either (a) possession of the direct or indirect ownership of more than fifty percent (50%)of the voting or income interest of the applicable corporation or other business entity, or (b) the ability, by contract or otherwise, to control the management of the applicable corporation or other business entity.

2. FORECASTS; PRODUCT AVAILABILITY

2.1   Forecasts. At least fifteen (15) days prior to the start of each calendar month during the Term, WSW agrees to provide Supplier with a non-binding forecast of its Products requirement for the upcoming calendar year, delineated by month ("**Forecast**"). During the Term, Supplier must maintain the capacity and availability to supply the quantity of Products communicated by the Forecasts; provided, however, the parties agree that unless otherwise expressly stated on an **Exhibit A**, WSW has no obligation to purchase any Products, regardless of Forecast, under this Agreement.

2.2   Buffer Inventory. Unless otherwise stated on an **Exhibit A**, Supplier will maintain a buffer inventory exclusively for WSW equal to ninety (90) days of WSW's most recent forecast for each applicable Product. Such buffer inventory shall be regularly replaced on a first-in, first-out basis. Supplier shall be responsible for such inventory until ownership is transferred to WSW in accordance with the delivery terms hereof.

2.3   Allocation. Supplier shall in any event use its best efforts to maintain the ability to supply all Products that WSW orders from Supplier. Supplier agrees that, if any event or reason will affect the supply of Product, WSW's order(s), subject to normal lead-time requirements, shall be filled according to an allocation plan no less favorable than that provided to any other Supplier customers. Supplier shall provide WSW with as much notice as possible if it anticipates or has reason to believe that Supplier's output of the Product will not be sufficient to meet all of WSW's requirements for any period.

2.4   Disaster Recovery and Redundancy. Supplier shall take reasonable action to ensure Products will be available, in suitable quantities and quality, for purchase by WSW, including, without limitation, the use of multiple sourcing and implementation of a disaster recovery plan in each case consistent with best industry standards.

2.5   Raw Materials. During the term of this Agreement, Supplier shall be responsible (at its sole expense) for obtaining, and shall store at no cost to WSW, any and all raw materials or other components and capital equipment required for the manufacture of the Products, in reasonable quantities consistent with WSW's forecasts and Purchase Orders. Supplier will ensure that all third parties responsible for the manufacture and/or supply of raw materials or components for Products have entered into an agreement with Supplier obligating such third parties to comply with all applicable Specifications, quality standards, and other technical requirements that may be necessary in order for the

such third parties to timely deliver conforming Product, or any portion thereof, to Supplier for the benefit of WSW. Supplier may not change third party sources without written consent of WSW.

3. ORDER PROCEDURE

3.1 Purchase Orders. From time to time during the Term, WSW may submit purchase orders ("**Purchase Orders**") for Products to Supplier. Purchase Orders must be in writing and submitted by WSW to Supplier via email, US mail, facsimile or any other method the parties may agree to. Each Purchase Order must include: (a) identification of Products ordered; (b) quantity of Products to be purchased; (c) total purchase price of Products ordered; (d) required delivery dates; (e) shipping instructions; and (f) any special instructions or other pertinent requirements.

3.2 Acceptance of Orders by Supplier. Supplier shall accept and acknowledge in writing, within twenty-four (24) hours after receipt thereof, all Purchase Orders submitted by WSW. All volume within two hundred percent (200%) of forecast ("**Permitted Volume**") shall be accepted, and Supplier shall use best efforts to accept all ordered volume. On each acknowledgment, Supplier shall include a firm delivery date ("**Delivery Date**") that, for Permitted Volume, may not (unless otherwise specified on an applicable **Exhibit A**) exceed five (5) business days from the date of the Purchase Order ("**Lead Time**"). Supplier must provide WSW prompt written notice of any anticipated delay relative the Delivery Date; provided, the foregoing does not diminish the fact that time is of the essence with respect to delivery. If Purchase Orders that are not acknowledged shall be deemed accepted. Supplier shall not be permitted to reject any Purchase Order unless it specifies a volume in excess of the Permitted Volume or specifies a Delivery Date that is not consistent with the applicable Lead Time.

3.3 Rush Orders. Supplier shall use its best efforts to meet WSW's requirements for reasonable rush orders. The parties shall negotiate in good faith the prices for such rush orders, taking into consideration Supplier's available inventory and additional shipping and personnel expense necessary.

3.4 Purchase Order Terms. Each Purchase Order is to be governed by this Agreement. If the terms of any acknowledgment, invoice, confirmation or similar document conflict with or are additional to the terms of this Agreement, the terms of this Agreement alone shall apply and shall govern regardless of execution of such document by one or both parties. Notwithstanding the foregoing, if a WSW-issued Purchase Order conflicts with the terms of this Agreement and is accepted by Supplier, then any conflict between such Purchase Order and this Agreement shall be resolved in favor the Purchase Order, for such order only.

3.5 No Minimum Quantities of Purchase. Except as may be delineated on an **Exhibit A**, WSW is not obligated to purchase any minimum quantities of any Product from Supplier under this Agreement or to place any Purchase Orders hereunder, provided that at termination or expiration of this Agreement (other than by WSW pursuant to Section 14.2), WSW shall purchase the buffer inventory up to the quantities required to be maintained pursuant to Section 2.2.

4. CHANGES AND CANCELLATION

4.1 Changes to Purchase Orders. WSW may, at any time prior to delivery of the Products, request to make changes to a Purchase Order. Supplier shall use good faith and commercially reasonable efforts to fulfill any such changes to the Purchase Orders made at any time prior to delivery. In the case of cancellation other than pursuant to Section 4.2, if Supplier has neither begun production of the Product for such cancelled Purchase Order nor purchased ingredients or materials specifically on behalf of WSW to manufacture such Products, then WSW shall not be required to pay for any costs incurred by Supplier with respect to a Purchase Order so cancelled or to pay any fees or penalties as a result of such cancellation. If Supplier has begun production or purchased noncancelable and unreturnable ingredients or materials specifically on behalf of WSW to manufacture such Products, then Supplier shall promptly notify WSW in writing of such fact and the parties shall agree upon a reasonable fee associated with such cancellation, which in no event shall exceed the amount set forth in the applicable Purchase Order.

4.2 Cancellation for Default. WSW may cancel any Purchase Order at any time in the event of any default or failure to comply with the terms and conditions of this Agreement by Supplier. If any Purchase Order is canceled for any default or otherwise for cause, WSW shall not be liable to Supplier for any amount and Supplier shall be liable to WSW for any damages sustained by such default or cause giving rise to the cancellation.

5. SHIPPING AND DELIVERY

5.1 Shipping. Supplier shall ship, or cause to be shipped, all Products in the manner specified in writing by WSW or as otherwise specified in an applicable Purchase Order for delivery no later than the Delivery Date, which may include without limitation procedures requested by WSW for masking the source of the Products (including without limitation removing Supplier-specific characteristics from packaging). All Products shall be packaged in accordance herewith and with the Specifications. If no method is specified in a Purchase Order, shipment is made Incoterms 2010 EXW (Ex Works), Supplier's dock, at which point all risk of loss of the shipped Products passes to WSW. All Products

delivered hereunder will be accompanied by the following documentation: (a) bill of lading, (b) specification sheet, (c)) a Certificate of Analysis and Certificate of Compliance, as described in Section 8.4; (d) all applicable product certifications (e.g., organic, non-GMO, gluten-free, organic) and (e) any other documentation that Supplier customarily includes in shipments of such Products or that Supplier is required to include by Regulatory Standards (defined below).

    5.2   Late Deliveries. Time of delivery is of the essence under this Agreement. If Supplier has reason to believe that a shipment will not meet the Delivery Date Supplier shall immediately notify WSW.

6.   ACCEPTANCE AND REJECTION OF PRODUCTS

    6.1   General Procedure. Without limiting WSW's separate remedies for breach of warranty, WSW may reject any Product delivered under this Agreement that is damaged prior to transit or that does not comply with the requirements of the applicable Purchase Order and/or the warranties set forth in Section 9 (a "**Defective Product**") by giving written notice of such Defective Product to Supplier within ninety (90) days after receipt thereof. WSW shall be entitled to reject all or a portion of an entire lot or shipment of a Product if a tested sample of that lot or shipment contains any Defective Products. Acceptance of Products by WSW shall not limit WSW's rights under Section 11. WSW shall return Defective Products to Supplier at Supplier's expense. With respect to Defective Products that have been properly rejected pursuant hereto, WSW shall not be required to pay for such Defective Products under Section 7.3. Supplier shall replace such Defective Products as quickly as possible and in any event the replacement stock shall be shipped within seven (7) days. WSW shall pay Supplier for such replacement Product in accordance with Section 7.3, or in the event that WSW has already paid for the Defective Products, Supplier shall replace such Defective Products at its own expense. If, after WSW rejects any Defective Product, Supplier fails to promptly replace such Defective Product, then WSW shall have the right, upon notice to Supplier, to cancel the applicable purchase order relative to the rejected Products without penalty and require refund of any payments made relative to the rejected Products.

    6.2   Appeal. If Supplier disagrees with WSW's determination that certain units of Product are Defective Product, the Parties will first use good faith efforts to settle such dispute within five (5) business days of Supplier's notice of disagreement. If the Parties are unable to resolve such dispute within this period, such Product shall be submitted to a mutually acceptable third-party testing service, initially. Such third party testing service shall determine whether such Product meets the Specifications, and the parties agree that such testing service's determination shall be final and binding on the parties. The party against whom the third party laboratory rules shall bear all costs of the third party testing.

7.   PRICES; PAYMENT

    7.1   Prices. Prices for Products are those set out on each applicable **Exhibit A**. Prices shown are in U.S. dollars unless otherwise expressly indicated. Supplier shall use commercially reasonable efforts to reduce its costs for each Product and shall decrease the prices for Products so that WSW receives the benefit of any such cost reduction. Such price reduction shall take effect no later than thirty (30) days after the corresponding reduction in Supplier's costs and will not be retroactive. Reductions in the purchase price of any Product shall apply to any purchase orders for which delivery of Products has not yet occurred. Cost reduction efforts shall not compromise the quality or reliability of any Product, and Supplier shall comply with the Quality Agreement with respect to design and process changes. Supplier represents and warrants that the Prices set forth on each applicable **Exhibit A** is at least as low as the price charged by Supplier to other buyers for the same or similar goods. If, at any time during the term, Supplier charges any other buyer a lower price for similar goods, Supplier shall apply that price to all same or similar Goods under this Agreement. If Supplier fails to meet the lower price, WSW may, at its option, in addition to all of its other rights under this Agreement or at Law, terminate this Agreement without liability. The parties shall reflect any adjustment to pricing under this Section in an amendment to the applicable **Exhibits A**. The pricing for each Product in effect immediately prior to a renewal of this Agreement shall apply to any Renewal Term unless Supplier can provide documentary evidence to justify an adjustment (e.g. details from a bill of materials and supporting pricing information), which shall in any event not exceed an increase of three percent (3%).

    7.2   Taxes. All prices include, and Supplier is solely responsible for, all costs and expenses relating to packing, crating, boxing, transporting, loading and unloading, customs, taxes, tariffs and duties, insurance and any other similar financial contributions or obligations relating to the production, manufacture, sale and delivery of Products.

    7.3   Payment Terms. Supplier shall invoice WSW with each shipment. WSW shall pay Supplier the full invoiced amount payable (other than disputed fees) within thirty (30) days after receipt of the later of invoice and shipment (such later date, the "**Accrual Date**"). Supplier shall not submit any invoice to WSW until shipment to WSW of the Products covered by such invoice. In addition to any right of setoff or recoupment provided by law, all amounts due to Supplier are considered net of indebtedness of Supplier (and its Affiliates) to WSW and its Affiliates, and WSW may set off against or recoup any amounts due to Supplier and its Affiliates. For these purposes, any moneys, including damages, losses, amounts recoverable under warranty terms, costs and expenses are deemed a debt due.

8. PRODUCT SPECIFICATIONS; QUALITY CONTROL; CERTIFICATES; COMPLIANCE WITH LAW

8.1 Specifications. Supplier shall supply Products that conform in all material respects to their applicable Specifications. If WSW finds it necessary or desirable to change Specifications for any Product, WSW may deliver a request for such change to Supplier ("**Product Change Order**"). Within ten (10) days of WSW's delivery of a Product Change Order, Supplier shall provide WSW with a written quotation containing the proposed increase or decrease in the unit price of the Products as a result of implementing such Product Change Order, if any. The parties shall make a good faith effort to agree upon any such increase or decrease as soon as reasonably practicable. Once the parties have agreed upon any resulting unit price change, Supplier shall incorporate the proposed change into the Products on a schedule to be agreed to by the parties. Supplier shall not proceed to implement any Product Change Order without WSW's written authorization.

8.2 Quality Control. Supplier shall maintain and follow, and shall ensure that any third parties responsible for the manufacture and/or supply of raw materials or components for Products maintain and follow, a quality control and testing program consistent with GMP and prevailing industry standards (the "**Quality Control Procedures**") and all Products supplied hereunder shall be manufactured in accordance therewith. "**GMP**" means the then-current good manufacturing practice and standards, as set forth in the United States Federal Food, Drug and Cosmetic Act, as amended, and any regulations promulgated thereunder, as amended, including without limitation 21 CFR §§117 and 210-211 (the "**FD&C Act**"), FDA preventative controls compliance, and third party GFSI compliance and Food Defense program confirmations. Supplier shall not change the materials, equipment, process or procedures used to manufacture or test Product in a manner that (i) would be inconsistent with the Specifications or GMP, (ii) would affect the form, fit, function, performance, or stability of a Product, or (iii) would require regulatory approval.

8.3 Compliance with Laws. All Product supplied to WSW hereunder shall be manufactured and supplied in compliance with all applicable present and future orders, regulations, requirements and laws of any and all federal, state, provincial and local authorities and agencies, including without limitation the FD&C Act, and all laws and regulations of such territories applicable to the transportation, storage, use, handling and disposal (together, "**Applicable Law**"). Supplier also represents and warrants to WSW that Supplier shall obtain and maintain all site licenses and government permits, including without limitation health, safety and environmental permits, necessary for the conduct of the actions and procedures undertaken to supply Product during the term of this Agreement. Upon WSW's request, Supplier shall promptly provide a copy of such licenses and permits.

8.4 Certificates. The Quality Control Procedures and all Applicable Law shall be referred to collectively, as the "**Regulatory Standards.**" Each batch of any Product delivered to WSW shall be accompanied by (i) a written certificate of analysis confirming that each unit of such Product in such batch has been tested in accordance with the mutual agreed acceptance tests and conforms to the Specifications ("**Certificate of Analysis**") and/or (ii) a written certificate of compliance confirming that the Product was manufactured and supplied in accordance with Regulatory Standards ("**Certificate of Compliance**"). WSW may then retest the batch of Product to confirm that it meets the Specifications.

8.5 Sampling. Upon WSW request, Supplier will (at its expense) send samples of the Products at the designated points in the manufacturing process and/or upon completion of the Product to a third-party verifier designated by WSW to test and certify the Product and/or its components and materials in accordance with the requirements hereof.

8.6 Records. Supplier shall keep complete, accurate and authentic accounts, notes, data and records pertaining to the manufacture, processing, testing, labeling, storage, and distribution of Products sold to WSW, including without limitation master production and control records, in accordance with the Regulatory Standards. Supplier shall retain, or cause to be retained, such records for a period of three (3) years following the date of manufacture, or longer if required by law, and upon request, shall make available to WSW copies of such records. During the term of this Agreement, WSW shall have the right to audit, survey, or verify the adherence of Supplier to the Quality Control Procedures, Regulatory Standards and this Agreement as set forth in Section 10.3. Upon written request to Supplier, WSW shall have the right to have its representatives or representatives of regulatory authorities visit the manufacturing facilities of Supplier during normal business hours to review Supplier's manufacturing operations, to assess its compliance with the Quality Control Procedures, Regulatory Standards and this Agreement, and to discuss any related issues with Supplier's manufacturing and management personnel. If appropriate or if required by applicable law or regulations, the parties will also enter into a separate quality agreement containing quality assurance provisions for the manufacture of Product ("**Quality Agreement**").

9. REPRESENTATIONS AND WARRANTIES

9.1 Warranty of Title and other Supplier Warranties. Supplier represents, warrants and covenants that (a) WSW will acquire good and clear title to the Products purchased hereunder, free and clear of all liens, claims, and encumbrances, (b) all materials and services provided by or on behalf of Supplier hereunder including, without limitation, the Products, are either owned or properly licensed by Supplier or are in the public domain and the use

thereof by WSW, its representatives, distributors, strategic partners, end users, and other direct and indirect customers will not infringe or misappropriate any Intellectual Property rights or other proprietary rights of any third party, (c) Supplier has not been debarred by the FDA, (d) Supplier is a corporation or other entity duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it is incorporated or established, has full corporate power and authority and the legal right to own and operate its property and assets and to carry on its business as it is now being conducted and as contemplated in this Agreement, has the full power to enter into this Agreement, to carry out its obligations under this Agreement and to grant the rights and licenses granted to WSW in this Agreement, and (e) Supplier's performance hereunder will not violate or conflict with any Regulatory Standards or any third party agreements.

9.2   Product Warranty. Supplier further represents, warrants and covenants that all Products manufactured hereunder will (i) conform to the applicable Specifications and the characteristics set forth therein; (ii) be manufactured and released in compliance with the Regulatory Standards; (iii) not be adulterated or misbranded within the meaning of the FD&C Act; (iv) be free and clear of any and all encumbrances, liens, or other third party claims; (v) conform to the applicable regulatory or industry certification requirements relating to the production of kosher, gluten free, non-GMO, and organic or organic compliant products; (vi) not infringe or misappropriate the intellectual property rights of any third party; and (vii) be fit for the purpose for which they are intended.

10. NOTIFICATIONS; REGULATORY INSPECTIONS; AUDIT

10.1   Notifications. Supplier shall notify WSW immediately upon becoming aware of: (a) any defect or condition that renders or may render any Product ineffective or dangerous; (b) any Product that is not in compliance with the Specification or any Regulatory Standards; (c) any breach by Supplier of this Agreement; (d) infringement by any third party of any intellectual property rights related to any Product; or (e) any written or oral inquiries, notifications or inspection activity by any regulatory authority or other governmental agency or authority of competent jurisdiction in regard to Products to be supplied to WSW hereunder (including inspection with respect to International Standards Organization standards). In addition, if either Supplier or WSW becomes aware of any information which reasonably supports a conclusion that a hazard may exist in any Product, either alone or as incorporated into a finished WSW product, and the defect could cause illness, death or bodily injury to any person or property damage ("**Hazard(s)**"), the party becoming aware of this information shall notify the other party of the Hazard. Whenever possible, and unless required by law, such party shall notify the other party shall prior to notifying any governmental agency. Supplier and WSW shall promptly exchange all relevant data and then, if practical, as promptly as possible, meet to review and discuss the information, tests, and conclusions relating to the alleged Hazard. At this meeting, the parties shall discuss the basis for any action, including a recall, and the origin or causation of the alleged Hazard. Each party shall, on request, provide to the other reasonable assistance in (a) determining how best to deal with the Hazard; and (b) preparing for, and making any presentation before, any governmental agency, which may have jurisdiction over Hazards involving the Products.

10.2   Regulatory Inspection. Supplier will permit a representative of WSW to be present during any inspection by any regulatory authority or other governmental agency or authority of competent jurisdiction in regard to Products to be supplied to WSW hereunder (including inspection with respect to International Standards Organization standards). Supplier will provide a reasonable description of any such governmental inquiries, notifications or inspections promptly, but in no event later than two (2) business days, after such notification, inquiry or inspection. Supplier will furnish to WSW (i) within two (2) business days after receipt, any report or correspondence issued by any regulatory authority in connection with such notification, inquiry or inspection to the extent relevant to any Product, and (ii) copies of proposed responses or explanations. Prior to responding, Supplier will discuss the proposed response with WSW and will implement in good faith any comments provided by WSW relating to a Product.

10.3   Audit. Supplier hereby grants to WSW and its authorized representatives, access to Supplier's premises and all pertinent documents and other information, whether stored in tangible or intangible form, including any books, records and accounts, in any way related to Supplier's performance under this Agreement (including Suppliers' processes and procedures) for the purpose of auditing Supplier's compliance with the terms of this Agreement. Supplier agrees to cooperate fully with WSW in connection with any such audit or inspection. Supplier shall maintain, during the term and for a period of ten (10) years after the term, complete and accurate books and records and any other financial information in accordance with GAAP. Supplier shall segregate its records and otherwise cooperate with WSW so as to facilitate any audit by WSW. If requested by WSW, Supplier shall use its best efforts to permit WSW and its representatives to obtain from subcontractors or other suppliers to Supplier the information and permission to conduct the reviews specified with respect to Supplier in this Section.

11. INDEMNIFICATION

11.1   Indemnity. Supplier shall defend, indemnify and hold harmless WSW, its Affiliates, and their respective officers, directors, employees, shareholders, direct and indirect customers, distributors, dealers, agents, successors

and assigns (the "**Indemnified Parties**") from and against any and all claims, suits, demands and actions (collectively, "**Claims**") as well any and all damages, losses, liabilities, costs and fees (including reasonable attorneys' fees and costs of notification, recall and shipment, including without limitation with respect to finished WSW products) in each case suffered or incurred by any of them in connection with, or resulting from (a) product liability in any way relating to a Product, (b) any alleged or actual defects in a Product, whether latent or patent, including without limitation from the failure of the goods to comply with Specifications and/or any Hazard, (c) any personal injury, illness, or death (including, but not limited to, actions in tort—including, but not limited to, negligence—contract, and strict liability) arising from any Product, (d) any breach by Supplier of any representation, warranty or covenant contained herein, (e) any act, omission, negligence, and/or willful misconduct of Supplier or its agents and/or (f) the actual or alleged infringement, misappropriation or other violation of any Intellectual Property rights or other proprietary rights of any person, firm or entity by any Product, or the use or sale thereof.

11.2 Procedures. WSW shall (a) promptly notify Supplier, in writing, of any Claim contemplated by Section 11.1 of which it becomes aware, and (b) permit Supplier to control, in a manner not adverse to WSW, the defense, settlement, adjustment or compromise of any such Claim using counsel reasonably acceptable to WSW. WSW may employ counsel, at its own expense to assist it with respect to any such Claim; provided, if such counsel is necessary because of a conflict of interest of either Supplier or its counsel or because Supplier does not assume control, Supplier shall bear such expense. Supplier may not and must not enter into any settlement that affects WSW's rights or interest without WSW's prior written approval. Unless Supplier fails to perform its obligations pursuant to this Section, WSW has no authority to settle any Claim on behalf of Supplier.

12. INTELLECTUAL PROPERTY

12.1 Existing Intellectual Property. Subject to Section 12.2 and 12.3, each party shall retain all rights in all intellectual property rights owned or controlled by such party prior to the Effective Date or developed or acquired by such party during the term of this Agreement. In the case of Supplier, this includes the intellectual property rights in and to its previously existing "off the shelf" flavors ("**OTS Flavors**"), in each case solely on a stand-alone basis.

12.2 License. The purchase of the Products shall confer on WSW and its Affiliates, and their respective subcontractors, distributors and agents, an irrevocable, world-wide, royalty-free, non-exclusive, license under Supplier's intellectual property rights in such Products (including without limitation patent applications, patents, copyrights, trade secrets, trademarks or other intellectual property rights it owns, licenses or controls), to use, test, market, sell, lease, distribute and/or otherwise dispose of such Products and to incorporate such Products into WSW's own products, as well as to convey to their respective customers a right to do the same with respect to any such WSW products that are sold to such customers.

12.3 Technology Transfer. Supplier agrees to provide all information reasonably necessary in order to carry out the provisions of this Section 12, including providing reasonable technical assistance, transfer of information, and making its technical personnel reasonably available to WSW. WSW shall compensate Supplier for its reasonable out-of-pocket and personnel costs for providing such information and technical assistance.

13. CONFIDENTIAL AND PROPRIETARY INFORMATION

13.1 Generally. Supplier acknowledges that it may be and/or may have been furnished with or may otherwise receive or have access to information or material that relates to WSW's highly sensitive confidential, restricted and proprietary information constituting Confidential Information. For purposes of this Agreement, "**Confidential Information**" is any data or information about WSW or the Products, that is important, competitively sensitive, and not generally known by the public, including, but not limited to, the identity of the Products, the volumes ordered and purchased hereunder, the Specifications, WSW's business plans, business prospects, customer lists, pricing information, market strategies, internal performance statistics, financial data, confidential personnel information concerning consultants or employees of WSW, operational or administrative plans, policy manuals, information about past, present or future products, research and development, customer information, inventions, processes, techniques, designs or technical information, data, and the existence, terms and conditions this Agreements. WSW's Confidential Information is provided "AS IS." Supplier agrees to preserve and protect the confidentiality of the Confidential Information and all of its physical forms, whether disclosed before this Agreement is signed or afterward. In addition, Supplier will not disclose or disseminate the Confidential Information for its own benefit or for the benefit of any third party. It is understood that said Confidential Information shall remain the sole property of WSW. Supplier will not, during or subsequent to the term of this Agreement, use WSW's Confidential Information for any purpose whatsoever other than the performance of its obligations hereunder behalf of WSW.

13.2 Exceptions. The previously stated obligations of confidentiality do not apply to any information that: (i) is publicly known and made generally available through no breach by Supplier of this Agreement nor any other wrongful act of Supplier; (ii) is previously known to Supplier on a non-confidential basis at the time of disclosure to Supplier by the WSW; (iii) has been rightfully received by Supplier on a non-confidential basis from a third party who is authorized

to make such disclosure; or (iv) Supplier had already developed prior to Supplier's access to the Confidential Information, in each case as evidenced by documents.

13.3  Return of Confidential Information. Supplier will not take or cause to be taken any physical forms of the Confidential Information (nor make copies of same) without WSW's written permission. Within three (3) days after the termination of this Agreement (or any other time at the WSW's request), Supplier will return to WSW all copies of Confidential Information in tangible form. Despite any other provisions of this Agreement, the requirements of this Section will survive termination of this Agreement.

13.4  Certain Laws. Each party will comply with all applicable export laws and regulations, including the U.S. Export Administration Regulations, in connection with any disclosure, transfer, or use in any way of Confidential Information disclosed hereunder which is within the scope of such regulations

13.5  Non-Disclosure Agreement. For purposes of clarity, the obligations set forth in this Section shall be in addition to those set forth in any non-disclosure agreement by and between the parties hereto (the "**NDA**"). If there is any conflict between the terms of this Agreement and the NDA, the more restrictive provisions shall control and govern.

## 14. TERM AND TERMINATION

14.1  Term. This Agreement's initial term commences on the Effective Date and remains effective for a period of three (3) years ("**Initial Term**"). This Agreement shall be renewed by WSW for additional successive one (1) year periods (each, a "**Renewal Term**" and together with the Initial Term, the "**Term**") unless WSW provides written notice to Supplier of its intent not to renew no later than thirty (30) days prior to the expiration of the then current term.

14.2  Termination for Cause. This Agreement may be terminated by either party for cause immediately by written notice if the other party (a) ceases to do business, or otherwise terminates its business operations, or (b) breaches any provision of this Agreement and fails to cure such breach within thirty (30) days of written notice describing the breach; provided, WSW party may terminate this Agreement immediately in the case of a breach of Section 13 (Confidentiality and Proprietary Information).

14.3  Last Time Buy. During the ninety (90) days immediately prior to the expiration of this Agreement pursuant to Section 14.1, or in the event that the parties mutually agree to terminate the Agreement, WSW may in its sole discretion submit a single order for Products. Supplier shall satisfy any such order as soon as reasonably practicable.

14.4  Survival. Sections 1.2, 5.2, 9, 13, 14.4, and 17 will survive termination or expiration of this Agreement. Except as expressly set forth in this Agreement, termination is in addition to all other rights and remedies a party may have.

## 15. RELATIONSHIP OF THE PARTIES

It is the express intention of the parties that Supplier is an independent contractor. Nothing in this Agreement shall in any way be construed to imply a joint venture or principal and agent relationship. Supplier agrees to indemnify and hold harmless WSW and its directors, officers, and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorney's fees and other legal expenses, arising directly or indirectly from (a) any negligent, reckless or intentionally wrongful act of Supplier or Supplier's employees, contractors or agents, and (b) a determination by a court or agency that the Supplier is not an independent contractor or that any Supplier employee, contractor or agent, is an employee of WSW, or (c) any breach by the Supplier or Supplier's employees, contractors or agents of any of the terms contained in this Agreement.

## 16. CERTAIN OBLIGATIONS OF SUPPLIER

16.1  Insurance. Supplier shall continuously maintain in full force and effect from thirty (30) days after the Effective Date of this Agreement until termination hereof General Liability insurance, with coverage adequate to cover all possible claims hereunder with an insurance carrier having a minimum AM Best rating of A/VII. The insurance policies maintained by Supplier shall also identify WSW as an additional named insured. The following endorsements shall be attached to the aforesaid policies: WSW shall be given thirty (30) calendar days' notice prior to cancellation of coverage of the insurance (ten (10) calendar days' notice for non-payment of premium). Supplier shall provide to WSW within 30 days following the execution of this Agreement the required certificates and endorsements.

## 17. MISCELLANEOUS

17.1  No Publicity. Except as required by law, Supplier shall not make any reference in any manner (including without limitation in any press release, customer list, website, presentation or other media or method) to WSW (including without limitation the use of WSW's name, logo, and identifying description), this Agreement, or the relationship without the prior written consent of WSW, which consent may be granted or withheld in their sole discretion.

17.2  Cumulative Remedies. Any specific right or remedy provided in this Agreement will not be exclusive but will be cumulative upon all other rights and remedies described in this Section and allowed under applicable law.

17.3  <u>Entire Agreement</u>. The parties acknowledge that this Agreement expresses their entire understanding and Agreement with respect to the Services, and that there have been no warranties, representations, covenants or understandings made by either party to the other except such as are expressly described in this Section. The parties further acknowledge that this Agreement supersedes, terminates and otherwise renders null and void any and all prior Agreements or contracts, whether written or oral, entered into between Supplier and WSW with respect to the matters expressly described in this Agreement.

17.4  <u>Amendments and Waivers</u>. Any term or provision of this Agreement may be amended, and the observance of any term, waived only by a writing signed by both parties hereto. No waiver of any default hereunder or any terms or conditions of this Agreement will be deemed to be a waiver of any other or subsequent default of any other term or condition, but will apply solely to the instance to which such waiver is directed.

17.5  <u>Governing Law</u>. This Agreement will be governed by the substantive laws of the State of Kentucky without regard to its choice of law rules. All parties submit, hereby, to the exclusive jurisdiction of either the state or federal Courts located in Jefferson County, Kentucky and agree to accept service of process by registered or certified mail, return receipt requested, in accordance with Kentucky or Federal rules of civil procedure.

17.6  <u>Notices</u>. Any notice required or permitted to be given under this Agreement shall be delivered (i) by hand, (ii) by registered or certified mail, postage prepaid, return receipt requested, to the address of the other party first set forth above, or to such other address as a party may designate by written notice in accordance with this Section, (iii) by overnight courier, or (iv) by fax with confirming letter mailed under the conditions described in (ii). Notice so given shall be deemed effective when received, or if not received by reason of fault of addressee, when delivered. Any notices or correspondence between the parties shall be forwarded to the addresses first set forth at the top of this Agreement, or to such other address as a party may request in a notice given pursuant to the terms of this Section.

17.7  <u>Severability</u>. If any provision of this Agreement is found invalid or unenforceable under judicial decree or decision, the remainder will remain valid and enforceable according to its terms. Without limiting the previous, it is expressly understood and agreed that each and every provision of this Agreement that provides for a limitation of liability, disclaimer of warranties, or exclusion of damages is intended by the parties to be severable and independent of any other provision and to be enforced as such. Further, it is expressly understood and agreed that if any remedy under this Agreement is determined to have failed of its essential purpose; all other limitations of liability and exclusion of damages described in this Section will remain in full force and effect.

17.8  <u>Injunctive Relief</u>. Supplier acknowledges that WSW, because of the unique nature of the Confidential Information, would suffer irreparable injury in the event of any breach by Supplier of certain provisions of this Agreement (including without limitation pursuant to Section 1.2 and 13). Supplier agrees that in the event of such a breach by Supplier, that WSW is entitled, without the necessity of filing a bond or other security or proving actual damages, to seek equitable relief to protect its interest herein, including injunctive relief, as well as money damages.

17.9  <u>Counterparts</u> This Agreement may be executed in multiple counterparts, any one of which will be considered an original, but all of which will constitute one and the same instrument. The parties agree that signatures transmitted and received via electronic means shall be treated as original signatures and shall be deemed valid, binding and enforceable by and against the parties.

17.10  <u>Bankruptcy</u>. All rights and licenses granted to WSW under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101(56) of the Bankruptcy Code. The parties agree that WSW, as a licensee of such rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code. The parties further agree that, in the event of the commencement of a bankruptcy proceeding by or against Supplier under the Bankruptcy Code, WSW shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property and all embodiments of such intellectual property, and same, if not already in its possession, shall be promptly delivered to WSW (i) upon any such commencement of a bankruptcy proceeding upon written request therefor by WSW, unless Supplier elects to continue to perform all of its obligations under this Agreement, of (ii) if not delivered under (i) above, upon the rejection of the Agreement by or on behalf of Supplier upon written request therefor by WSW.

[Signature page follows.]

The parties hereto have executed this Agreement by persons duly authorized as of the Effective Date.

| SUPPLIER | WSW |
|---|---|
| [Flavorman] | Waterloo Sparkling Water Corp.. |
| By _[signature]_ | By _[signature]_ |
| Print Name Aaron Parker | Print Name Adam Price |
| Title Chief Operating Officer | Title Director of Operations |

## EXHIBIT A-n
### [FORM]
### PRODUCT IDENTIFICATION, PRICING AND SPECIFICATIONS

BACKGROUND.  This exhibit ("**Exhibit A-n**") is issued under that certain Supply Agreement (the "Agreement"), by and between Waterloo Sparkling Water Corp., a Delaware corporation with offices at 2612 E. Cesar Chavez St. #200, Austin, TX 78702 ("**WSW**"), and Flavorman, a Kentucky corporation with offices at 809 South 8th Street, Louisville, KY 40203 ("**Supplier**"). The terms and conditions of the Agreement are hereby incorporated by reference.  Terms capitalized herein but not defined herein shall have the meanings set forth in the Agreement.  In the event of a conflict between the Agreement and the terms hereof, this Exhibit shall control.

Date of Exhibit: 12/3/2018

Product Description:

Various Natural Flavors

Product Pricing (current formulations as of 12/3/2018):

| Flavor | Usage (by weight) | As of 12/3/2018 - post-Supplier Agreement 5 Gallon Containers (Base Contract Price) | | | As of 12/3/2018 - post-Supplier Agreement 55 Gallon Containers (3% Discount) | | | As of 12/3/2018 - post-Supplier Agreement 270 Gallon Containers (6% Discount) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Price Per Pound | Price Per Gallon | Cost Per Case (24 Count / 12 Ounce Cans) | Price Per Pound | Price Per Gallon | Cost Per Case (24 Count / 12 Ounce Cans) | Price Per Pound | Price Per Gallon | Cost Per Case (24 Count / 12 Ounce Cans) |
| Natural Grapefruit Flavor WONF | 0.17886% | $7.44 | $50.32 | $0.25 | $7.22 | $48.81 | $0.24 | $7.00 | $47.30 | $0.23 |
| Natural Mango Flavor WONF | 0.14025% | $9.49 | $64.65 | $0.25 | $9.21 | $62.71 | $0.24 | $8.92 | $60.77 | $0.23 |
| Natural Black Cherry Type | 0.24611% | $4.12 | $28.71 | $0.19 | $3.99 | $27.85 | $0.18 | $3.87 | $26.99 | $0.18 |

*Volume-based pricing tiers to be determined.

Minimum Purchase Commitment

Subject to Supplier's performance under the Agreement, WSW agrees to purchase 1,000 gallons of the Product described above in each 12-month period following the Date of Exhibit.

Specifications:

- Characteristics [Supplier to fill in pertinent information]
    - Ingredient Statement:
    - Physical Characteristics:
    - Aroma:
    - Flavor:
    - Pungency:
    - Acidity:
    - Color Value:
    - Allergens Tolerance:
    - Residual Solvents:
    - Flash Point:
    - Refractive Index @ [ ] degrees C:
    - Specific Gravity @ [ ] degrees C:
    - Optical Rotation:
    - Shelf Life:
- Certifications
    - Kosher
    - Certified Gluten Free

- - - 
    - Non-GMO Project Verified
  - Pre-Shipment and Transport Environmental and Storage Requirements:
    - Temp:
    - Light Tolerance:
  - Packaging: [5 gallon containers, 55 gallon containers, 270 gallon totes]

The parties hereto have executed this Exhibit by persons duly authorized as of the Date of Exhibit specified above.

**SUPPLIER**

**Flavorman**

By:_____

Print Name:_____

Title:____    Title:____

**WSW**

**Waterloo Sparkling Water Corp.**

By: _[signature]_____

Print Name: __Adam Price_____

-2-

**EXHIBIT B**

**RESTRICTED PARTIES**

- **LaCroix**
- **Bubly (Pepsi)**
- **New York Seltzer**
- **Kirkland Signature**
- **Topo Chico**
- **Richard's Sparkling Rainwater**
- **Big Swig**
- **Rambler**
- **Schweppes**
- **Poland Springs**
- **Polar Seltzer**
- **Dasani Sparkling**
- **Aquafina Sparkling**
- **Smartwater Sparkling**
- **Seagram's Sparkling Seltzer**

## EXHIBIT C

## RIGHT OF FIRST REFUSAL

(1)     Definitions:

a.     "Business" shall mean, collectively, all or substantially all of, or the material assets of Supplier, including any or all of the intellectual property comprising the OTS Flavors, and/or Supplier's furnishings, fixtures, and equipment related to the production thereof.

(2)     In the event Supplier receives (or delivers) an acceptable bona fide offer from a third party related to a proposed sale of the Business (or any portion thereof or interest therein), then Supplier shall give WSW written notice setting forth the name and address of the prospective purchaser, the price and terms of the offer, a copy of the purchase and sale agreement, and all exhibits, copies of any real estate purchase agreement or agreements, proposed security agreements and related promissory notes, assignment documents, title insurance commitment and any other information that WSW may request in order to evaluate the offer.

(3)     WSW shall then have the right of first refusal to purchase Supplier's interest covered by such offer at the price and upon the same terms of the offer.  WSW shall have sixty (60) calendar days after receipt of Supplier's notice of offer and the furnishing of all reasonably requested information within which to notify Supplier in writing of its intent to accept or reject the offer.  Silence on the part of WSW through the entire sixty (60) day period shall constitute rejection.  Supplier may not rely upon any notice from WSW of its intention to accept or reject the offer nor shall such notice be effective unless such notice is in writing and signed by an officer of WSW.

(4)     In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, WSW may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash part of the offer, an independent appraiser shall be designated by WSW to determine such amount, and his or her determination shall be binding.

(5)     If the proposed sale includes assets of Supplier not related to the Business, then WSW may, at its option, elect to purchase only the assets related to the Business and an equitable purchase price shall be allocated to each asset included in the proposed sale.

(6)     To the extent any other agreements between the parties may be inconsistent with, or conflict with the terms of the right of first refusal contained herein, the terms of this right of first refusal shall control.

(7)     If this Agreement has been assigned by Supplier in accordance with its terms, then this right of first refusal shall also apply to the successors and assigns.

(8)     The election by WSW not to exercise its right of first refusal as to any offer shall not affect its right of first refusal as to any subsequent offer.

(9)     Any sale, attempted sale, assignment or other transfer of the rights granted effected without first giving WSW the right of first refusal described above shall be void and of no force and effect.

(10)     If WSW does not accept the offer referenced herein, then Supplier may conclude the sale to the purchaser who made the offer provided WSW's consent to the assignment be first obtained, which consent will not be unreasonably withheld.